UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MICHAEL J. MADIGAN
and MICHAEL F. McCLAIN

No. 22 CR 115

Hon. John Robert Blakey

**GOVERNMENT'S MOTIONS *IN LIMINE* TO ADMIT CERTAIN EVIDENCE
AS DIRECT EVIDENCE OF THE RACKETEERING ENTERPRISE OR, IN
THE ALTERNATIVE, UNDER FEDERAL RULE OF EVIDENCE 404(b)**

MORRIS PASQUAL
Acting United States Attorney

AMARJEET S. BHACHU
DIANE MacARTHUR
TIMOTHY CHAPMAN
SARAH E. STREICKER
JULIA K. SCHWARTZ
Assistant United States Attorneys

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

APPLICABLE LAW .................................................................................................... 3

I.    Admission of Other Conduct—Even Major Criminal Conduct—Is Proper to Prove the Existence of a Racketeering Enterprise. .......................... 3

II.    Other Acts Evidence Is Also Independently Admissible under Federal Rule of Evidence 404(b). ...................................................................................... 5

III.    The Prosecution Is Entitled to Prove Its Case by Evidence of Its Own Choice under Federal Rule of Evidence 403, Unless Unfair Prejudice Results. ...................................................................................................................... 7

MOTIONS *IN LIMINE* ............................................................................................ 9

I.    Motion 1: Evidence Concerning Efforts by the Defendants to Arrange for Payments to the Spouse of Public Official E Should Be Admitted. ............. 9

A.    Background ................................................................................................ 9

B.    Evidence Concerning Efforts by the Defendants to Arrange for Payments to the Spouse of Public Official E Is Highly Relevant Direct Evidence that Proves the Existence of the Enterprise ................. 10

C.    Evidence Concerning Efforts by the Defendants to Arrange for Payments to the Spouse of Public Official E Is Also Independently Admissible Under Rule 404(b). .......................................................... 13

D.    The Evidence Is Not Unfairly Prejudicial. ................................... 14

II.    Motion 2: Evidence Concerning Efforts by the Defendants to Arrange for Payments to Individual 13W-4 Should Be Admitted. .................................. 15

A.    Background ............................................................................................. 15

B.    Evidence Concerning Efforts to Arrange for Payments to Individual 13W-4 Is Highly Relevant Direct Evidence that Proves the Existence of the Enterprise. ........................................................... 20

C.    Evidence Concerning Efforts to Arrange for Payments to Individual 13W-4 Is Also Independently Admissible Under Rule 404(b). .................. 21

D.    The Evidence Is Not Unfairly Prejudicial. ..................................................... 23

III.   <u>Motion 3</u>: Evidence Concerning Efforts to Have a Gas Utility Hire a Madigan Associate Should Be Admitted. ................................................ 23

   A.    Background ................................................................................................. 23

   B.    Evidence Concerning Efforts to Have a Gas Utility Hire a Madigan Associate Is Highly Relevant Direct Evidence that Proves the Existence of the Enterprise. .......................................................... 25

   C.    Evidence Concerning Efforts to Have a Gas Utility Hire a Madigan Associate Is Also Independently Admissible Under Rule 404(b). ............ 27

   D.    The Evidence Is Not Unfairly Prejudicial. ..................................................... 29

IV.   <u>Motion 4</u>: Evidence Concerning the Decision to Cease Payments to Individual MA-1 Should Be Admitted. ................................................ 29

   A.    Background ................................................................................................. 29

   B.    Evidence Concerning the Decision to Cease Payments to Individual MA-1 Is Highly Relevant Direct Evidence that Proves the Existence of the Enterprise and the Pattern of Racketeering. ................... 30

   C.    Evidence Concerning the Decision to Cease Payments to Individual MA-1 Is Also Independently Admissible Under Rule 404(b). ..................... 31

   D.    The Evidence Is Not Unfairly Prejudicial. ..................................................... 32

V.    <u>Motion 5</u>: Evidence Concerning Other AT&T Hires Made at the Defendants' Request Should Be Admitted. ......................................... 33

   A.    Background ................................................................................................. 33

   B.    Evidence Concerning Other AT&T Hires Made at the Defendants' Request Is Highly Relevant Direct Evidence of the Existence of the Enterprise and the Pattern of Racketeering. ................................... 35

   C.    Evidence Concerning Other AT&T Hires Made at the Defendants' Request Is Also Independently Admissible Under Rule 404(b). ............... 35

   D.    The Evidence Is Not Unfairly Prejudicial. ..................................................... 36

VI.   <u>Motion 6</u>:  Evidence Concerning McClain's Role as Madigan's Agent in Connection with Major Legislation Should Be Admitted. ................................ 37

A.      Background ................................................................................. 37

B.      Evidence Concerning McClain's Role as Madigan's Agent in Connection with Major Legislation Is Highly Relevant Direct Evidence of the Existence of the Enterprise and Proof of McClain's Role as to the ComEd Bribery Charges ........................................ 38

C.      The Evidence Is Not Unfairly Prejudicial. ................................... 40

VII.    <u>Motion 7</u>: Evidence Concerning McClain's Role in Response to Sexual Harassment Allegations Should Be Admitted. .................................... 42

A.      Background ................................................................................. 42

B.      Evidence Concerning McClain's Role in Response to Sexual Harassment Allegations Is Highly Relevant Direct Evidence of the Enterprise and McClain's Role as an Agent. ................................. 44

C.      The Evidence Is Not Unfairly Prejudicial. ................................... 44

VIII.   <u>Motion 8</u>: Evidence Concerning Madigan's Efforts to Interfere with Employment Decisions at Metra for the Benefit of His Associates Should Be Admitted. .............................................................. 45

A.      Background ................................................................................. 45

B.      Evidence Concerning Madigan's Efforts to Interfere with Employment Decisions at Metra for the Benefit of His Associates Is Highly Relevant Direct Evidence of the Enterprise. ................... 46

C.      The Evidence Is Not Unfairly Prejudicial. ................................... 46

<u>CONCLUSION</u> ....................................................................................... 47

## INTRODUCTION

The UNITED STATES OF AMERICA, by and through its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, respectfully moves *in limine* as follows:

- <u>Motion 1</u>: Evidence Concerning Efforts by the Defendants to Arrange for Payments to the Spouse of Public Official E Should Be Admitted.

- <u>Motion 2</u>: Evidence Concerning Efforts by the Defendants to Arrange for Payments to Individual 13W-4 Should Be Admitted.

- <u>Motion 3</u>: Evidence Concerning Efforts to Have a Gas Utility Hire a Madigan Associate Should Be Admitted.

- <u>Motion 4</u>: Evidence Concerning the Decision to Cease Payments to Individual MA-1 Should Be Admitted.

- <u>Motion 5</u>: Evidence Concerning Other AT&T Hires Made at the Defendants' Request Should Be Admitted.

- <u>Motion 6</u>: Evidence Concerning McClain's Role as Madigan's Agent in Connection with Major Legislation Should Be Admitted.

- <u>Motion 7</u>: Evidence Concerning McClain's Role in Response to Sexual Harassment Allegations Should Be Admitted.

- <u>Motion 8</u>: Evidence Concerning Madigan's Efforts to Interfere with Employment Decisions at Metra for the Benefit of His Associates Should Be Admitted.

Count One of the superseding indictment charges former Speaker Michael Madigan and his close confidante Michael McClain with racketeering conspiracy. R. 37, Count 1. Count One alleges that the defendants conspired to participate in the affairs of an association-in-fact enterprise and to use Madigan's and former Alderman Daniel Solis's positions (i) to receive unlawful personal financial advantage for Madigan and his

1

law firm, Madigan and Getzendanner, and to (ii) arrange for private benefits for Madigan's political allies and associates. R. 37, ¶ 13(a)-(b).[1]

In order to prove the existence of this association-in-fact enterprise, and to prove that Madigan and McClain worked together to accomplish the goals of the enterprise as set forth in the superseding indictment, the government seeks to introduce evidence of instances where: (i) Madigan and McClain acted together to arrange for the initiation or cessation of payments to Madigan associates, (ii) McClain acted as Madigan's agent in connection with major legislation and other sensitive matters, such as responding to sexual harassment allegations; and (iii) other instances where the defendants pursued or discussed obtaining benefits for Madigan loyalists.

Under binding Seventh Circuit precedent, evidence of uncharged conduct is admissible "in a RICO prosecution to prove the nature of an enterprise and the defendant's participation in it." *United States v. Salerno*, 108 F.3d 730, 738 (7th Cir. 1997). Evidence that Madigan and McClain acted in concert together to accomplish the stated purposes of the charged enterprise, and instances where McClain acted as Madigan's agent and advisor are thus direct evidence of the charged conspiracy and the enterprise.

The evidence described in this motion is plainly admissible as direct evidence of the racketeering conspiracy. Rule 404(b) of the Federal Rules of Evidence does not apply, because the evidence described herein is not evidence of "other" acts; rather, it is

---

[1]    The government incorporates the description of the evidence set forth in the government's motion to admit coconspirator statements.

evidence of the actual charge laid out in Count One of the superseding indictment, as well as other charges.[2]

However, even if the evidence is independently analyzed under Rule 404(b), this evidence is admissible for the non-propensity purpose of demonstrating defendants' *modus operandi*, intent, motive, and plan, including (i) their intent and motive in arranging for payments for Madigan's associates; (ii) their intent and *modus operandi* in using McClain and others as intermediaries to pay Madigan's associates; and (iii) their intent and *modus operandi* in using false reporting to conceal payments made to Madigan's associates and the purpose for which the payments were made. Furthermore, the high probative value of this evidence substantially outweighs any potential prejudice.

## APPLICABLE LAW

### I. Admission of Other Conduct—Even Major Criminal Conduct—Is Proper to Prove the Existence of a Racketeering Enterprise.

Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Fed. R. Evid. 401.

It is well-established that, in order to prove the existence of a RICO enterprise, the government may introduce evidence of uncharged crimes. The Seventh Circuit has "allowed the government to use uncharged criminal acts in a RICO prosecution to prove the nature of an enterprise and the defendant's participation in it." *Salerno*, 108 F.3d at

---

[2] The evidence described in this motion is plainly admissible as evidence of the racketeering conspiracy. The government files this motion in an abundance of caution, in order to prevent any claim that the government has not complied with the Court's Rule 404(b) deadline, and to obtain an expeditious ruling so the government may plan appropriately for what will be an extended trial.

738. In *Salerno*, the government introduced evidence of prior crimes committed by defendant Salerno, specifically, the defendant's participation in demanding and collecting street tax. *Id.* The Seventh Circuit held this evidence was properly admitted to establish the existence of the enterprise and Salerno's participation in the enterprise. Indeed, the Seventh Circuit concluded that "[i]t is difficult to comprehend how one could prove the existence of an enterprise comprised of 'a group of individuals associated in fact,' and organized solely for the purpose of committing crimes, without presenting evidence of the crimes that detail the structure, common purpose, and continuity of the charged enterprise." *Id.* at 739.

Similarly, in *United States v. Matera*, 489 F.3d 115, 120 (2d Cir. 2007), the Second Circuit upheld the district court's decision to admit evidence of various crimes committed by enterprise members, including multiple uncharged murders. The Second Circuit held that Rule 404(b) had no application, because the evidence was introduced to "prove an essential element of the RICO crimes charged—the existence of a criminal enterprise in which the defendants participated." *Id.* (collecting cases). The court recognized that proof of a racketeering enterprise may involve "a considerable degree of prejudice," yet held that such "evidence may be of important probative value in proving the enterprise." *Id.* at 121. *Accord United States v. Thai*, 29 F.3d 785, 812-13 (2d Cir. 1994) (uncharged acts admissible as evidence of "the existence and structure of the [RICO] enterprise").

This principle that other acts evidence is admissible in RICO conspiracy prosecutions has been applied by numerous other courts. *See, e.g., United States v. Baez*, 349 F.3d 90, 93 (2d Cir. 2003) (per curiam) ("[I]t is well settled that in prosecutions for

racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise."); *accord United States v. Herrera*, 51 F.4th 1226, 1257 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 2636 (2023); *United States v. Polchan*, No. 08 CR 115, 2010 WL 11459831, at *3 (N.D. Ill. Oct. 20, 2010), *aff'd sub nom. United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014).

## II.    Other Acts Evidence Is Also Independently Admissible under Federal Rule of Evidence 404(b).

Federal Rule of Evidence 404(b)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Under Rule 404(b)(2), "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* at 404(b)(2).

Where "contested evidence proved specific portions of the indictment" or "is embraced by the conspiracy in the indictment," it is direct evidence of the offense and is not considered "other acts" evidence under Rule 404(b). *United States v. Alviar*, 573 F.3d 526, 538 (7th Cir. 2009); *see also United States v. Ferrell*, 816 F.3d 433, 443 (7th Cir. 2015) ("Rule 404(b) does not apply to direct evidence of the crime charged.").

Where Rule 404(b) applies, the rule "allows the use of other-act evidence only when its admission is supported by some propensity-free chain of reasoning." *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc). "Rule 404(b) excludes the evidence if its relevance to 'another purpose' is established *only* through the forbidden propensity inference." *Id.* Thus, the government may not admit other act evidence

merely to complete the story. *See United States v. Nelson*, 958 F.3d 667, 670 (7th Cir. 2020).

Rule 404(b) requires careful examination of "other acts" evidence; it does not support automatic exclusion of such evidence. *United States v. Tinsley*, 62 F.4th 376, 383 (7th Cir. 2023) ("While 'other-acts' evidence often 'raises special concerns about unfair prejudice,' that alone is not sufficient to prohibit admission." (citation omitted)); *United States v. Morgan*, 929 F.3d 411, 427 (7th Cir. 2019) (evidence admissible because it was "clearly relevant for the non-propensity purpose of proving the required intent"). Under the law of the Circuit, if the proffered evidence meets the requirements of Rule 404(b), as interpreted in *United States v. Gomez*, it should be admitted. *See Gomez*, 763 F.3d at 860.

The Seventh Circuit and other circuit courts of appeal have approved the admission of other acts evidence in bribery cases to prove *modus operandi*, intent, plan, and absence of mistake. *See, e.g., United States v. Shields*, 999 F.2d 1090 (7th Cir. 1993). In *Shields*, a judicial bribery case, defendant disputed that he intended to bribe a judge. *Id.* at 1099. "The information about [defendant's] behavior years earlier [in bribing

6

another judge for his own benefit] was relevant because it demonstrated he had the ability, willingness and chutzpah to bribe a judge" for someone else's benefit. *Id.*[3]

## III.    The Prosecution Is Entitled to Prove Its Case by Evidence of Its Own Choice under Federal Rule of Evidence 403, Unless Unfair Prejudice Results.

The Court must also consider whether any challenged evidence is admissible under Federal Rule of Evidence 403. As the Seventh Circuit recently emphasized in setting aside a lower court's decision barring the government from introducing relevant evidence, the "familiar" and "standard" rule is that the "prosecution is entitled to prove its case by evidence of its own choice," and that allowing the government to make its case with the evidence it selects allows the government to tell "a colorful story with descriptive richness," the persuasive power of which is "often essential" for jurors to do their jobs. *United States v. Johnson*, 89 F.4th 997, 1004 (7th Cir. 2024) (quoting *Old Chief v. United States*, 519 U.S. 172, 186-87 (1997)). Therefore, under Rule 403, relevant evidence should only be excluded where its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, or undue

---

[3]       *See also United States v. Repak*, 852 F.3d 230, 242-48 (3d Cir. 2017) (in bribery and extortion case, evidence of defendant's prior uncharged solicitation of benefits from others was relevant to his knowledge and intent because the evidence made it more likely that defendant accepted charged benefits with an understanding that they were intended to influence the award of contracts to the bribers); *United States v. Willis*, 844 F.3d 155, 169-70 (3d Cir. 2016) (in bribery case, admitting evidence of prior uncharged bribes because evidence would "demonstrate that [the defendant] was not mistaken about the nature of the transactions involved in the . . . renovation and fully intended to accept bribes and commit extortion"); *United States v. Carrasco*, 79 F.4th 153, 163-64 (1st Cir. 2023) (in bribery case, evidence of additional payments to defendant, alleged to be uncharged kickbacks properly admitted to show "not only [defendant's] intent in accepting the payments for which he was charged but also his *modus operandi* for receiving payments in connection with his agreement with [a consultant] to influence the mayors to steer contracts to [the consultant's] firm in exchange for payments").

delay. Fed. R. Evid. 403. Mere prejudice to the defendant is not reason enough to exclude evidence. *United States v. Curry*, 79 F.3d 1489, 1496 (7th Cir. 1996). Rule 403 balancing hinges upon whether the prejudice is "unfair." *United States v. McKibbins*, 656 F.3d 707, 712 (7th Cir. 2011) ("Because all probative evidence is to some extent prejudicial, we have consistently emphasized that Rule 403 balancing turns on whether the prejudice is 'unfair.'"); *United States v. Vargas*, 552 F.3d 550, 557 (7th Cir. 2008) ("most relevant evidence is, by its very nature, prejudicial, . . . [but] evidence must be unfairly prejudicial to be excluded" (citation omitted)).

Rule 403 balancing takes into account the importance of the evidence: "The more probative the evidence, the more the court will tolerate some risk of prejudice, while less probative evidence will be received only if the risk of prejudice is more remote." *United States v. Boros*, 668 F.3d 901, 909 (7th Cir. 2012) (citation omitted). Regarding RICO prosecutions in particular, "[w]hen a defendant engages in a criminal enterprise which involves very serious crimes, there is a likelihood that evidence proving the existence of the enterprise through its acts will involve a considerable degree of prejudice. Nonetheless, the evidence may be of important probative value in proving the enterprise." *Matera*, 489 F.3d at 121. *Accord United States v. Williams*, 205 F.3d 23, 24

(2d Cir. 2000) (where uncharged crimes did not involve crimes more serious than charged crimes, there was no undue prejudice under Rule 403).

In short, courts apply Rule 403 in a manner that favors the admission of relevant evidence, and only exclude evidence when unfair prejudice threatens to overwhelm its probative value.

## MOTIONS *IN LIMINE*

I.  <u>Motion 1</u>: Evidence Concerning Efforts by the Defendants to Arrange for Payments to the Spouse of Public Official E Should Be Admitted.

A.  Background

During a phone call intercepted on or about July 2, 2018, Madigan and McClain discussed Madigan's efforts to arrange for payments to be made to the spouse of an Illinois representative, Public Official E. McClain Phone, Session #7531 (7/2/2018).[4] Madigan told McClain that Public Official E "came to me and same story, he needs money. And he had the thought that maybe I could help his wife on something." Madigan explained, "one thought I had was with um Jay Doherty[5]. . . . And, um, not necessarily with ComEd, but I had the thought that I could actually put Jay Doherty on a retainer." Madigan added, "we'd tell [Public Official E] to prepare some monthly reports on what

---

[4]  A table of all recordings the government currently intends to introduce in its case-in-chief is attached as an exhibit to the government's *Santiago* proffer. The government will tender copies of the draft transcripts to the Court. The list of recordings, and the transcripts, are in draft form and may be amended before trial.

[5]  As detailed in the government's *Santiago* proffer, filed contemporaneously with this motion, Jay Doherty was one of the coconspirators in the ComEd-related bribery conduct. Doherty served as an intermediary for payments from ComEd to Madigan associates from 2011 to 2019. The payments by ComEd to these Madigan associates through Doherty is also at issue in this case.

she's doing." McClain said, "Right, right." Madigan said, "So he's got it on file." Madigan instructed McClain to "give it some thought," and McClain asked for permission to call Public Official E ("may I call [Public Official E]"), to which Madigan responded, "No harm, yeah, sure."

In a subsequent call, Public Official E thanked McClain for helping his wife get a job at the Secretary of State's Office, which demonstrates that McClain acted on Madigan's request. McClain Phone, Session #12281 (8/29/2018).

### B. Evidence Concerning Efforts by the Defendants to Arrange for Payments to the Spouse of Public Official E Is Highly Relevant Direct Evidence that Proves the Existence of the Enterprise.

It is the government's burden to prove, among other things, that each defendant knowingly conspired to conduct or participate in the conduct in the affairs of the charged enterprise, and that the enterprise was (or would be) an "enterprise" as defined by law. The Seventh Circuit pattern jury instruction for association-in-fact enterprises provides that "[t]he term 'enterprise' can include a group of people or legal entities associated together for a common purpose of engaging in a course of conduct. This group may be associated together for purposes that are both legal and illegal." Seventh Circuit Pattern Instruction (18 U.S.C. § 1961(4) Enterprise—Association in Fact) (2023 ed.). Moreover, a jury may consider whether the charged enterprise has "an ongoing organization or structure, either formal or informal, and whether the various members of the group functioned as a continuing unit." *Id.*

In this case, the superseding indictment alleges that the enterprise was an association-in-fact enterprise that included defendants Madigan, McClain, the Office of

the Speaker, the Thirteenth Ward Democratic Organization, and Madigan & Getzendanner. R. 37 Count 1 ¶ 2. Further, the charge alleges that the members of this enterprise "constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise." *Id.* The stated objectives of the enterprise included, but were not limited to: "(i) to exercise, to preserve, and to enhance MADIGAN's political power and financial well-being; (ii) to financially reward MADIGAN's political allies, political workers, and associates for their loyalty, association with, and work for MADIGAN; and (iii) to generate income for members and associates of the enterprise through illegal activities." *Id.* ¶ 3. The charge also specifies the relative roles of Madigan and McClain in the enterprise. For example, the superseding indictment explains that Madigan was the "leader of the enterprise," who directed the activities of his close friend and associate, McClain. *Id.* ¶ 7. McClain, in turn, served the enterprise, by among other things, acting as an intermediary for Madigan to make demands for benefits to various third parties; causing the creation of false documents and formulating means of indirect payment in order to conceal the true nature of payments made to Madigan's political allies, political workers, and associates; conveying Madigan's instructions and messages to public officials, lobbyists, and executives; providing strategic advice to Madigan on sensitive matters; and otherwise acting as Madigan's agent. *Id.* ¶ 9. The indictment further alleges that the defendants conspired to participate in the affairs of this enterprise over the span of approximately 8 years—from in or around 2011 and continuing through in or around 2019. *Id.* ¶ 10.

The evidence concerning the defendants' efforts to arrange for payments to the spouse of Public Official E is plainly direct evidence of the enterprise alleged in Count One. As an initial matter, it is the government's burden to prove that Madigan and McClain and the entities Madigan controlled were associated-in-fact, for the common purpose of achieving the stated objectives of the enterprise. Here, one of the purposes that the enterprise members focused on was the financial reward of Madigan's political allies for their association and work with Madigan. The above-described interceptions, wherein Madigan and McClain work together for the purpose of devising a means to pay the spouse of a political ally, clearly constitute proof of the enterprise, as well as the defendants' efforts to accomplish one of the common purposes of the enterprise.

Moreover, the government may also argue that, by financing the lifestyle of a fellow legislator, Madigan and McClain were also seeking to preserve and enhance Madigan's own political power by engendering loyalty from Public Official E, whom the evidence will show was a fellow member of the House of Representatives.

In addition, as noted above, the superseding indictment describes McClain's role within the enterprise as including formulating means of indirect payment in order to conceal the true nature of payments made to Madigan's political allies. This provides a sterling example of McClain being involved in precisely such an effort. Furthermore, the nature of the call also demonstrates the relative relationship within the enterprise between Madigan and McClain. As described earlier, Madigan in this instance brought a problem to McClain to solve, and McClain in turn asked for permission from Madigan to contact Public Official E. The sequence of events within this call also demonstrates the

relative positions of Madigan and McClain within the racketeering enterprise—Madigan as leader, and McClain as his subordinate. The call, then, helps the government demonstrate the structure of the enterprise as alleged in the indictment. These calls are therefore admissible as direct evidence of the charged enterprise.

In addition, Madigan's suggestion that Public Official E's wife be paid through "Jay Doherty" but "not necessarily with ComEd" demonstrates that Madigan knew Doherty was an intermediary for the payments from ComEd to his political allies. McClain Phone, Session #7531 (7/2/2018). And Madigan's suggestion that Public Official E prepare pretextual reports for Doherty's "file" is also highly probative direct evidence, as it shows that Madigan was aware of other enterprise activity at issue in this case, namely, that Doherty was being used as a nominee to direct payments to other Madigan loyalists, and that there was no *bona fide* business relationship between Doherty and those hired by ComEd at Madigan's request. Madigan's connection of these events also therefore serves to demonstrate the continuity of the enterprise's activities over time. In short, this evidence is not "other acts" evidence; rather, it is evidence of the existence of the charged enterprise. *See Salerno*, 108 F.3d at 739 (government is entitled to present evidence of conduct that proves the structure, common purpose, and continuity of the charged enterprise).

### C. Evidence Concerning Efforts by the Defendants to Arrange for Payments to the Spouse of Public Official E Is Also Independently Admissible Under Rule 404(b).

Even if Rule 404(b) did apply, and it does not, McClain and Madigan's conversation about having a state representative's wife placed on the Doherty payroll, who would

prepare phony reports, is evidence of the defendants' intent to conceal and knowledge of the nature of the corrupt payments in this case.

These conversations are "clearly relevant for the non-propensity purpose of proving the required intent," which will be a key issue in dispute. *Morgan*, 929 F.3d at 427. The government would not rely on the forbidden propensity inference that conspirators must have facilitated the placement of Madigan allies under Jay Doherty's contract with ComEd to funnel money to those Madigan associates because he and Madigan discussed another possible placement with Doherty and pretextual reports justifying the hiring. Instead, these discussions show that both defendants were aware that there was no *bona fide* business relationship between Doherty and those hired at Madigan's request, and that Doherty was being used as a conduit to hide the true nature of payments made to Madigan associates. This evidence is thus admissible for the purpose of proving the conspirators' intent, knowledge, *modus operandi*, and plan. *See, e.g.*, *United States v. Vaughn*, 267 F.3d 653, 659 (7th Cir. 2001) (admitting evidence of prior drug transactions as evidence of defendant's "method of operation," *modus operandi*, intent, and plan in conducting charged drug transactions).

### D. The Evidence Is Not Unfairly Prejudicial.

Whether analyzed as direct evidence of the racketeering enterprise or other act evidence under Rule 404(b), the recordings sought to be admitted here are only prejudicial insofar as they constitute proof of key facts in issue in this case, such as the existence of the charged enterprise and the knowledge and intent of the defendants. The probative value of this evidence is not substantially outweighed by the risk of unfair

14

prejudice. *See* Fed. R. Evid. 403; *United States v. Chanu*, 40 F.4th 528, 545 (7th Cir. 2022). The probative value is particularly high given that the recordings include Madigan's own statements about Doherty's role as an intermediary. There is no basis to exclude these recordings. *See Matera*, 489 F.3d at 121 (". . . there is a likelihood that evidence proving the existence of the enterprise through its acts will involve a considerable degree of prejudice. Nonetheless, the evidence may be of important probative value in proving the enterprise"); *Morgan*, 929 F.3d at 429.[6]

II.   <u>Motion 2</u>: **Evidence Concerning Efforts by the Defendants to Arrange for Payments to Individual 13W-4 Should Be Admitted.**

   A.   **Background**

In 2018, a Madigan associate ("Individual 13W-4") was accused of sexual harassment and left his position with the 13th Ward organization.[7] McClain then contacted various individuals and solicited them to make monthly monetary payments to the Madigan associate. McClain sought to conceal those payments as so-called "consultant" payments, by proposing the creation of phony "contracts" to justify the

---

[6]   Judge Leinenweber's blanket ruling in a related prosecution excluding all potential Rule 404(b) evidence absent permission of the Court, without specifically ruling on the evidence concerning Public Official E, does not apply in this case. *See United States v. McClain et al.*, No. 20 CR 812, Dkt. 161 at 2 (N.D. Ill.) (Leinenweber, J.). The indictment in that case did not include a RICO conspiracy count. Where, as here, the indictment charges RICO conspiracy, the government is permitted to introduce evidence that would otherwise be considered "other acts" evidence as direct evidence of the structure and roles in the enterprise. Moreover, the government respectfully submits that Judge Leinenweber's ruling was erroneous insofar as its analysis of Rule 404(b) was concerned.

[7]   As noted earlier, the 13th Ward Democratic Organization is an entity that is a part of the association-in-fact enterprise that is charged in Count One.

payments and using some of the same intermediaries as were used to conceal payments from ComEd and AT&T. R. 37, Count 2, Count 23.

Individual 13W-4 (like Individual 13W-1, Individual 13W-2, and Individual 13W-3, who are identified in the superseding indictment) served Madigan as a member of the 13th Ward Democratic Organization, one of the foundations of Madigan's political power. The government's evidence at trial will show that Individual 13W-4 was also the brother of the 13th Ward Alderman. In February 2018, Madigan terminated Individual 13W-4's association with the 13th Ward Democratic Organization and other Madigan-related committees, after a woman alleged that Individual 13W-4 sexually harassed her.

After Individual 13W-4's termination, McClain arranged for Madigan's allies to make monthly payments to Individual 13W-4. Like the payments from ComEd and AT&T to Madigan allies, these payments were accompanied by false documentation and concealed through intermediaries. Indeed, three of the intermediaries also served as conduits for payments to Madigan's allies from ComEd and AT&T (McClain, Intermediary 3, and Intermediary 4).

Specifically, on or about August 28, 2018, McClain spoke with Intermediary 3 and explained that Individual 13W-4 had asked him for help finding a job. McClain Phone, Session #12132 (8/28/2018). McClain stated that "between you and me," "the Speaker" had said that after he got sworn in as Speaker, "he [Madigan] intends to help" Individual 13W-4. McClain explained that, in the meantime, McClain thought that a few "of us" could "kick in like a grand or something" each month for six months to help Individual 13W-4 out. *Id.* McClain told Intermediary 3 that he did not mean for Intermediary 3 to hire

Individual 13W-4 as a consultant but that, at the same time, Individual 13W-4 had to prepare a paragraph or two in case the Internal Revenue Service questioned why Individual 13W-4 was receiving money. McClain told Intermediary 3 that "you'll have a contract but you'll also have a piece of paper." *Id.* Significantly, this call occurred while Intermediary 3 was sending Madigan ally Ed Moody $4,500 every month from ComEd. Intermediary 3 had "paper" from Moody in the form of a contract with him and the monthly invoices Moody sent to him.

On or about August 28, 2018, a few minutes after speaking with Intermediary 3, McClain called Individual MA-2, a former high-level member of Madigan's staff, who was employed as a consultant at the time. McClain Phone, Session #12138 (8/28/2018).[8] McClain told Individual MA-2, "between you and me," that the "Speaker" intended to help Individual 13W-4 after he got sworn in. McClain then described his proposal to collect $1,000 each month from individuals, including Individual MA-2, to help Individual 13W-4. McClain told Individual MA-2 that, as far as McClain was concerned, "except for the people that are signing on, uh no one else even knows about it except for our friend," a reference to Madigan. Individual MA-2 told McClain that he would have some discussions within his consulting firm, although McClain responded that he would "like to keep the people that know this real small" and that Individual MA-2 should withdraw the request if it necessitated a board meeting. As McClain put it, "the more people that know it's just, it's too easy for people to babble." McClain further explained that "at one point in time" he had "maybe five consultants working for [him]" and that "all they ever

---

[8]      Individual MA-2 will be called as a witness in the government's case in chief.

really did is give me pieces of paper." *Id.* This was in part a reference to McClain's role as an intermediary to funnel payments from ComEd to Ed Moody (as charged in Count Two), who gave him "pieces of paper" to make it falsely appear that he was performing legitimate work.

Later that day, McClain called Intermediary 4 with the same proposal to help Individual 13W-4 before the "Speaker" could "take care of [Individual 13W-4]." McClain Phone, Session #12178 (8/28/2018). Intermediary 4 agreed to make monthly contributions for Individual 13W-4.

On or about August 29, 2018, McClain reported to Madigan, and told him that he had "put 4 or 5 people together that are willing to contribute to uh, help with monthly things for the next 6 months like I mentioned to ya for [Individual 13W-4]." McClain Phone, Session #12278 (8/29/2018). McClain told Madigan he was ready to talk to Individual 13W-4 about it. McClain asked if Madigan wanted to mention it to the 13th Ward Alderman or "stay out of it." *Id.* Madigan responded, "I think I oughta stay out of it." *Id.*

About five minutes after speaking with Madigan, McClain called the Alderman of the 13th Ward. McClain Phone, Session #12279 (8/29/2018). McClain asked if the Alderman wanted to know what McClain was "gonna propose to [Individual 13W-4]," or would "like to stay in the dark on that." *Id.* The Alderman told McClain that he would "rather stay in the dark." *Id.*

The next day, August 30, 2018, McClain called Individual 13W-4. McClain Phone, Session #12339 (8/30/2018). McClain explained that, while "we're lookin' for a job for you,"

18

McClain got "a few guys together to try to give you a bridge . . . of uh, some money." *Id.* McClain said it would be a "consultant contract" with "like three, three or four or five people" who would pay Individual 13W-4 "five or six grand a month." *Id.* McClain explained that it would be a "written contract" where Individual 13W-4 would "promise to, to do some research for them" and that, at the end of the six months, Individual 13W-4 would "give them that paper" containing "a paragraph or two" about officials such as senators, county board members, or city council members and perhaps a "little bit about maybe who they're, they're closest to." *Id.* McClain explained this was so that, "if they got audited . . . they can show the IRS agent the contract and the can also show 'em that one or two-page document." *Id.* McClain told Individual 13W-4 that Individual 13W-4 could give the "paperwork," that is, the same document "to all five or six people" and did not have "to do six different ones." *Id.* Individual 13W-4 agreed to the proposal. *Id.*

On August 31, 2018, McClain described the so-called "report" to Individual MA-2, which would discuss "like six house members, three senators, three county board, three city council members and talk about um, things that little are known about them." McClain Phone, Session #12515 (8/31/2018). Individual MA-2 said he envisioned using Individual 13W-4 for real work, not for "the bullshit report." When Individual MA-2 again stated that he wanted Individual 13W-4 to "actually really help[] me," McClain told Individual MA-2 that, under that circumstance, "I'll just have your contract different." *Id.*

19

**B.** **Evidence Concerning Efforts to Arrange for Payments to Individual 13W-4 Is Highly Relevant Direct Evidence that Proves the Existence of the Enterprise.**

The evidence concerning efforts to arrange for payments to Individual 13W-4 is direct evidence that proves the existence of the enterprise. Indeed, the same grounds that support the admission of the effort to pay Public Official E's spouse are present here. One of the stated purposes of the charged enterprise was to financially reward Madigan's political allies for their association and work with Madigan; here, Madigan and McClain worked towards compensating an ousted member of the 13th Ward Democratic Organization by arranging for payments from multiple individuals over a period of some six months. Moreover, the interceptions here indicate that the efforts to financially reward Individual 13W-4 were jointly undertaken; the interceptions reflect that the project was done with Madigan's knowledge; McClain reported in to Madigan to advise him that the plan is progressing. The government may also argue that by financially rewarding a Thirteenth Ward operative (the brother of the current Alderman, no less), Madigan was seeking to preserve and enhance his own base of political power within the 13th Ward. In addition, the evidence demonstrates McClain's role within the enterprise, which is alleged to include formulating means of indirect payment in order to conceal the true nature of payments made to Madigan's political allies. In this instance, McClain suggests to various individuals that they have Individual 13W-4 prepare, as one individual described it, a "bullshit report" to have on file in case the IRS came knocking to inquire about the reason for the recurrent payments to Individual 13W-4. Of course, none of the payors sought Individual 13W-4 out for payment; rather, it was McClain who

did so, in his role as Madigan's trusted agent. The sequence of calls also confirms McClain's subordinate position to Madigan. The duration of the intended payments also serves to illustrate the continuity of the enterprise's activities over time.

### C. Evidence Concerning Efforts to Arrange for Payments to Individual 13W-4 Is Also Independently Admissible Under Rule 404(b).

In the alternative, this evidence is independently admissible under Federal Rule of Evidence 404(b). The structure of the payments to Individual 13W-4 demonstrates defendants' intent to use intermediaries and false justifications to conceal the true nature of payments made for Madigan's benefit. Indeed, as noted, three of the intermediaries who paid Individual 13W-4 were *also* intermediaries for payments to Madigan allies from ComEd (McClain and Intermediary 3) and AT&T (Intermediary 4). And, as with ComEd and AT&T, the payments McClain arranged for Individual 13W-4 allowed Madigan's loyal ally to be secretly compensated, which meant that Madigan did not have to make any payments himself—thus saving Madigan and his political operation money.

In fact, McClain directly compared the Individual 13W-4 payments to the ComEd ghost subcontractor scheme when he told Individual MA-2 that he paid people who just "give me pieces of paper." Ed Moody was one of those people; he received payments from ComEd, funneled through McClain, and all he did was prepare essentially make-work pieces of paper for a few months. In *United States v. McClain et al.*, Case No. 20 CR 812 (N.D. Ill.), Moody testified that McClain gave him a list of representatives to call (Trial Tr. 3673-80) and that he made a "very minimal" report of his contacts with legislative offices, in which he instructed representatives to "reach out to Mr. McClain with any constituency concerns related to ComEd." Trial Tr. 3680, 3682. Moody also testified that

21

at one time he passed out flyers for McClain associated with ComEd (Trial Tr. 3691), and did a door-to-door canvas of consumer input for ComEd. Trial. Tr. 3790-95. The real purpose of the payments from ComEd, according to Moody, was "to stay active in my politics," which, based on Moody's testimony, meant allowing Moody to continue to perform political services for Madigan. Trial Tr. 3692. From 2014 to 2018, after Moody's ComEd payments started to come from intermediaries other than McClain, Moody did not perform any work related to ComEd. Trial Tr. 3705, 3714, 3736, 3752, 3755, 3822-23.

The effort to arrange payments for Individual 13W-4 therefore proves the defendants' intent in arranging financial payments to Madigan's associates through a trusted group of intermediaries, and their awareness and intention to employ methods to conceal the true nature of such payments—they were not intended as *bona fide* payments, rather they were meant to compensate Madigan's political allies and associates for doing little to no work.

This same method of payment through intermediaries to Madigan associates, with "paper" to make the payments appear legitimate, are hallmarks of the ComEd and AT&T schemes charged in the indictment. The defendants' efforts to conceal payments to Madigan associates are probative evidence of their intent, knowledge, *modus operandi*, and plan. *See, e.g.*, *Vaughn*, 267 F.3d at 659 (admitting evidence of prior drug transactions as evidence of defendant's "method of operation," *modus operandi*, intent, and plan in conducting charged drug transactions).

Efforts to conceal or circumvent attention have also been held to be non-propensity evidence admissible under Rule 404(b). In *United States v. Anzaldi*, 800 F.3d

22

872, 882 (7th Cir. 2015), the Seventh Circuit held that defendant's efforts to be paid with checks in amounts under $10,000 as fees for helping others submit false tax returns, were admissible to show the defendant's "intent to defraud the United States because she would not attempt to hide from the government her involvement with these tax returns if she truly believed her tax positions were legitimate." *Id.* The same is true here. Defendants' efforts to conceal payments made to Madigan cronies are probative of their knowledge that the payments were illegitimate.

### D. The Evidence Is Not Unfairly Prejudicial.

Whether analyzed as direct evidence or other act evidence under Rule 404(b), evidence of payments to Individual 13W-4 are only prejudicial insofar as they demonstrate the existence of the charged enterprise, the defendants' corrupt intent and *modus operandi*, all key issues in dispute in this case. All relevant evidence is prejudicial; such evidence may be excluded only if its probative value is substantially outweighed by the risk of unfair prejudice. *See* Fed. R. Evid. 403; *Chanu*, 40 F.4th at 545. Any potential prejudice can be ameliorated by an appropriate limiting instruction explaining the legitimate purposes for which the evidence may be considered (as proof of enterprise and to demonstrate intent and *modus operandi*).

### III. Motion 3: Evidence Concerning Efforts to Have a Gas Utility Hire a Madigan Associate Should Be Admitted.

### A. Background

The government seeks to admit evidence, including but not limited to two recordings (McClain Phone, Session #3204 (5/23/2018), 3282 (5/23/2018)), in which McClain discusses efforts to have a gas utility company hire a Madigan associate. Specifically, on

or about May 23, 2018, McClain and ComEd employee Fidel Marquez (a conspirator as to the ComEd-related conduct charged in Count 2 of the superseding indictment, who did not begin cooperating with the government until after this call), discussed a conversation between Marquez and a representative from another regulated utility, a gas company. McClain Phone, Session #3204 (5/23/2018). Marquez told McClain, "So I get a call from [a gas company employee], you know who she is at [the gas company]?" Marquez then described how the gas company was getting "pushed really hard" to hire someone at Madigan's request, and that Marquez had told her to consider the hire. McClain said, "Good. Perfect," and further commented, "not everyone . . . likes gettin' the, the calls, right?" Marquez said, "I don't know if anybody likes it, but people need to understand how, what's behind all this." Marquez further stated, "I says, '. . . maybe one day you'll have an ask and this will be remembered.'" McClain responded, "Right. Exactly," followed by "it all comes . . . around, right?" In other words, Marquez relayed to McClain that he told the gas company executive that it was important to hire people when asked to do so by Madigan, so that when you needed to ask for official action in return, Madigan would oblige. McClain said, "Right. Exactly," indicating that he agreed with coconspirator Marquez's understanding of the connection between hiring someone at Madigan's request and legislative success in Springfield. McClain Phone, Session #3204 (5/23/2018).

Later that same day, McClain related his conversation with Marquez to Madigan's relative. McClain commented, "I mean that's how the sys—this is, You can't be offended with that. . . so you got pressure too? Are you kiddin' me?" McClain Phone, Session #3282

24

(5/23/2018). Later in the conversation, McClain said, "I just love these people that, they, they are in a regulatory body, right? And they're offended if people ask for favors. Hello? Dumb shits." McClain thus referred to the concept of "pay-to-play," where businesses give benefits to public officials and their associates, with the goal of receiving future favorable official action in return. McClain further criticized the gas company representative for not recognizing that she needed to hire somebody because the gas company was—like ComEd—"in a regulatory body" subject to legislative oversight.

**B.  Evidence Concerning Efforts to Have a Gas Utility Hire a Madigan Associate Is Highly Relevant Direct Evidence that Proves the Existence of the Enterprise.**

These two recordings (McClain Phone, Session #3204, 3282 (5/23/2018)) are direct evidence of the charged enterprise, and thus Rule 404(b) does not apply. Here, the interceptions concern efforts to financially reward a Madigan associate, which is alleged to be one of the purposes of the enterprise. McClain, a member of the enterprise, endorses this initiative and applauds how Marquez handles an inquiry concerning a request to hire a Madigan associate. Moreover, the superseding indictment describes the enterprise's illegal activities to include "soliciting and receiving bribes and unlawful personal financial advantage from persons and parties having business with the State of Illinois and the City of Chicago, or otherwise subject to the authority and powers vested in MADIGAN and other public officials acting on MADIGAN's behalf" and "(b) using MADIGAN's powers as Speaker . . . in order to cause third parties to financially reward MADIGAN, his political allies, political workers, and associates." R. 37 Count 1, ¶ 4. The gas company was unquestionably one such third-party from which Madigan and McClain sought to

25

extract benefits, as it was a public utility regulated by the State of Illinois over whom Madigan had significant control as Speaker. McClain's cavalier jokes to Madigan's relative about how people "in a regulatory body" should not be "offended if people ask for favors," referring to them as "dumb shits," demonstrates that he was intimately aware of the purpose of the enterprise. McClain Phone, Session #3282 (5/23/2018). The fact that Madigan was involved in a job request at the gas company is demonstrated by Marquez's statement to McClain that, according to the gas company representative with whom Marquez spoke, the gas company was getting "pushed really hard" to hire someone at Madigan's request.

This evidence also demonstrates McClain's relationship with Madigan as his trusted agent and advisor. *See, e.g.*, *United States v. King*, 627 F.3d 641, 649 (7th Cir. 2010) (affirming admission of evidence that "helped establish the relationship among" gang members, "the rank of those men within the gang, and King's criminal intent").

Furthermore, these two calls are also direct evidence of the ComEd conspiracy, alleged in Count Two and the AT&T conspiracy, alleged in Count Twenty-Three. The recordings relate to McClain's efforts to solicit payments from another regulated utility company on Madigan's behalf. In fact, McClain discussed those efforts with ComEd employee and coconspirator Fidel Marquez, at the same time the conspirators who had orchestrated bribe payments from ComEd to Madigan associates were considering adding yet another Madigan crony to the ComEd payroll. These calls are direct evidence of the ComEd conspirators' understanding of the corrupt purpose and intent underlying payments made by ComEd at Madigan's request.

26

These calls are thus direct evidence of the purpose of both the Count One, Count Two, and Count Twenty-Three conspiracies.

### C. Evidence Concerning Efforts to Have a Gas Utility Hire a Madigan Associate Is Also Independently Admissible Under Rule 404(b).

Even if Rule 404(b) did apply, and it does not, McClain's statements about his role in terms of the gas company are admissible for the non-propensity purposes of demonstrating the conspirators' corrupt intent in linking hiring requests directed to a regulated entity to official action in Springfield.

Here, McClain's statements to coconspirator Marquez and his codefendant's relative are relevant to both defendants' intent, without relying on the forbidden propensity inference that the defendants must have solicited a bribe with regard to ComEd because they did so with regard to solicitations of the gas company.

Defendants' efforts to shake down another regulated entity and McClain's laughter about it—as well as his acknowledgement that such payments are calculated for the purpose of receiving official action in exchange—is proof of McClain's understanding of the corrupt purpose and the intent underlying payments solicited from and made by ComEd (and also by AT&T and other companies) at Madigan's request. These calls demonstrate that McClain sought payments from regulated entities (like ComEd, AT&T, and the gas company) for the purpose of corruptly influencing and rewarding Madigan in connection with state business—and even brazenly laughed at any regulated-business official who questioned the need to hire someone at Madigan's request. This evidence is admissible for the purpose of proving the conspirators' intent, knowledge, *modus operandi*, and plan. *See, e.g., Vaughn*, 267 F.3d at 659.

27

These calls are highly probative as to a key issue in dispute, intent, as McClain expressly connected payments to Madigan associates with legislation in Springfield. McClain drew out that connection, by saying that the gas company is "in a regulatory body, right? And they're offended if people ask for favors." McClain Phone, Session #3282 (5/23/2018). McClain further summarized and approved of Marquez's statement, "'that's what happens when you do, when you're in this game. . . . Maybe someday you can ask for a favor," and commented, "you can't be offended with that." McClain Phone, Session #3282 (5/23/2018). The gas company recordings thus undercut any defense that the hires at issue in Count Two (ComEd) and Count Twenty-Three (AT&T) were merely job recommendations or typical lobbying.

These recordings also demonstrate McClain's awareness of Madigan's ability to exploit the vulnerability of regulated utility companies, and that Madigan and McClain intentionally reached out to regulated companies—which they knew depended on legislation—fully expecting those companies to say "yes," given this dependence. McClain's comments are "clearly relevant for the non-propensity purpose of proving the required intent." *Morgan*, 929 F.3d at 427 (evidence that defendant distributed methamphetamine in the past was admissible to show intent to distribute).[9]

---

[9]  Judge Leinenweber ruled that the two calls about the gas company were inadmissible propensity evidence under Rule 404(b) in the government's prior prosecution, *United States v. McClain et al.*, No. 20 CR 812, Dkt. 161 at 2; Trial Tr. 2197-99. However, the indictment in that case did not include a RICO conspiracy charge, as in this case. Moreover, the government respectfully submits that this ruling was erroneous insofar as its analysis of Rule 404(b) was concerned.

### D. The Evidence Is Not Unfairly Prejudicial.

Whether analyzed as direct evidence or other act evidence under Rule 404(b), the recordings sought to be admitted here are only prejudicial insofar as they demonstrate the existence of the charged enterprise (which is an element of the offense) and corrupt intent, two key issues in dispute in this case. All relevant evidence is prejudicial; such evidence may be excluded only if its probative value is substantially outweighed by the risk of unfair prejudice. *See* Fed. R. Evid. 403; *Chanu*, 40 F.4th at 545. Particularly with respect to other act evidence, the Seventh Circuit has instructed that "[t]he court's Rule 403 balancing should take account of the extent to which the non-propensity fact for which the evidence is offered actually is at issue in the case." *Gomez*, 763 F.3d at 857. These recordings (McClain Phone, Session #3204, 3282 (5/23/2018)) are highly probative as to both proof of enterprise as well as McClain's intent in securing high paying consulting positions for Madigan's cronies from regulated entities.

Moreover, these two calls are of a similar nature to other recordings the jury will hear about the defendants' conduct. The jury will hear all of these calls, and the prejudicial effect of two additional, highly probative calls should not shift the balance in favor of exclusion. The probative value of McClain's statements far outweighs any potential prejudice. *See, e.g., Matera*, 489 F.3d at 121; *Morgan*, 929 F.3d at 429.

## IV. <u>Motion 4</u>: Evidence Concerning the Decision to Cease Payments to Individual MA-1 Should Be Admitted.

### A. Background

During a December 2018 phone call in which McClain and Fidel Marquez (a coconspirator with respect to the bribery conduct charged in Count Two of the

superseding indictment) discussed terminating ComEd's payments to Doherty subcontractors Eddie Acevedo and Edward Moody,[10] McClain also discussed another consultant, Individual MA-1, who was engaged for many years as a lobbyist at a Chicago-area hospital. The government's evidence will show that Individual MA-1 was a Madigan ally, who had worked to defend challenges to legislative redistricting maps, among other efforts to assist Madigan's political operation. Madigan took care of Individual MA-1 by arranging for Individual MA-1 to receive consulting fees from a local hospital. The government's evidence is further expected to show that Individual MA-1's health declined, and that in 2018, he was no longer able to provide the services of a consultant owing to his health.

McClain explained to Marquez that he told a high-level employee at the hospital that he would terminate Individual MA-1's contract, because "[y]ou just can't ask a company to be donating $50,000 a year . . . when the guy can't even . . . really uh talk very well anymore. . . You're setting up your friends in order to protect a friend." McClain Phone, Session #17803 (12/5/2018).

**B.  Evidence Concerning the Decision to Cease Payments to Individual MA-1 Is Highly Relevant Direct Evidence that Proves the Existence of the Enterprise and the Pattern of Racketeering.**

Evidence related to Individual MA-1 is direct evidence of the Count One racketeering conspiracy. Count One expressly references the multiple third parties from which the defendants sought to solicit bribes, and in no way limited the description of the

---

[10]     These matters are described in greater detail in the government's *Santiago* proffer, which was filed contemporaneously with this motion.

charged enterprise to ComEd and AT&T. R. 37 at 6-7. Evidence of defendants' efforts to solicit bribes from another Chicago-area entity with business before the Illinois legislature is squarely within the superseding indictment's allegations and is highly probative direct evidence of the charged conspiracy.

Moreover, in the interception described above, McClain positions himself as the individual who conveys directions to terminate payments to Madigan associates when necessary, thus constituting proof of his role within the charged enterprise as Madigan's subordinate, in charge of communicating directives from the boss.

Additionally, this evidence constitutes evidence of a pattern of racketeering activity undertaken, where Madigan and McClain sought payments for their associates who performed no legitimate work in return.

### C. Evidence Concerning the Decision to Cease Payments to Individual MA-1 Is Also Independently Admissible Under Rule 404(b).

Even if Rule 404(b) did apply, and it does not, evidence concerning Individual MA-1 is admissible evidence of the defendants' knowledge of the true nature of the corrupt payments in this case.

McClain's conversation with Marquez is relevant to defendants' knowledge and intent. In one intercepted call (McClain Phone, Session #17803 (12/5/2018)), McClain directly linked the payments to Individual MA-1 to the Doherty subcontractors who were paid by ComEd to influence Madigan and who did little or no work. McClain was talking with coconspirator Fidel Marquez (before he started cooperating) about whether to terminate some of the ComEd ghost subcontractors. In that very same conversation, McClain described another lobbyist (Individual MA-1) paid by a private entity with

31

business before the General Assembly who similarly did no work, thus demonstrating the parallels between the payments made to Individual MA-1 and the Doherty subcontractors. In both cases, it was McClain—not the businesses themselves—who made the decision as to when a subcontractor could be terminated. McClain described his and Madigan's efforts to continue payments from a hospital to a Madigan ally (Individual MA-1), even though that individual's health had deteriorated. This conversation demonstrates McClain's knowledge that there was no *bona fide* reason for the payments, which McClain linked to the payments by ComEd to individuals like Edward Moody and Edwarde Acevedo. This evidence is thus admissible for the purpose of proving the conspirators' intent, knowledge, *modus operandi*, and plan. *See, e.g., Vaughn*, 267 F.3d at 659; *United States v. Sullivan*, 911 F.2d 2, 6-7 (7th Cir. 1990) (uncharged solicitation of bribe in a RICO prosecution was relevant to show defendant's plan to run agency through bribery and corruption).

### D. The Evidence Is Not Unfairly Prejudicial.

The recordings sought to be admitted here are only prejudicial insofar as they constitute proof of enterprise and the pattern of racketeering activity, as well as corrupt intent, key issues in dispute in this case. The probative value of this evidence is not substantially outweighed by the risk of unfair prejudice. *See* Fed. R. Evid. 403; *Chanu*, 40 F.4th at 545. The probative value is particularly high given that the statements concerning Individual MA-1 are part of the same conversation between McClain and Marquez where they discuss payment arrangements as to ComEd ghost subcontractors.

V.  <u>Motion 5</u>: Evidence Concerning Other AT&T Hires Made at the Defendants'
    Request Should Be Admitted.

    A.    Background

Count Twenty-Three of the indictment charges defendants with conspiring to arrange for AT&T Illinois to pay Individual FR-1 in 2017, at Madigan's and McClain's request. R. 37, Count 23. Although the Count Twenty-Three conspiracy focuses on 2017, the racketeering conspiracy charged in Count 1 spans from 2011 to 2019. R. 37, Count 1. The government seeks to present evidence of McClain's hiring requests of AT&T, other than Individual FR-1, including requests before 2017, as direct evidence of Count One.

For example, while McClain was arranging for AT&T to hire Individual FR-1, McClain recommended AT&T retain Law Firm A, the law firm of one of Madigan's allies. Significantly, that request came the day after AT&T representatives offered Individual FR-1 a "consultant" position and the day before Individual FR-1 accepted the offer. AT&TIL-0071429 (April 27, 2017 email from Individual ATT-1 stating that "Mike McClain has suggested that we Explore whether there might be some Opportunities for [Law Firm A] to work with att").

AT&T made other hiring decisions at Madigan's request. For example, Individual FR-1's sons' firm was engaged in the summer of 2015 at the repeated urging of Madigan's Chief of Staff. AT&TIL-0028119; AT&TIL-0027601; AT&TIL-0027603; AT&TIL-0027976. The firm was engaged for the last few months of 2015, despite internal hesitance within AT&T as to whether the firm would provide any value. AT&TIL-0028577, AT&TIL-0027619; AT&TIL-0063338.

In 2016, the year before AT&T began paying Individual FR-1, McClain interceded on Madigan's behalf to prevent AT&T from terminating consulting contracts for Individual FR-1's sons' firm and another former Representative's (Individual FR-2) consulting firm. AT&T had contracts with those firms but had informed both firms that their contracts would not be renewed for 2016. McClain contacted Paul La Schiazza (AT&T Illinois' president) and requested AT&T re-engage both firms for 2016.

On January 27, 2016, Individual FR-1 (who at that time was still a legislator) asked Individual ATT-3 why AT&T was not going to continue its relationship with his sons' company and suggested that Madigan told him the contract would remain in place. AT&TIL-0016930. McClain communicated with AT&T employees about this. AT&TIL-0012005; AT&TIL-0014408; AT&TIL-0017712. Individual FR-1's sons' contract was renewed for calendar year 2016 too.

On January 11, 2016, McClain also asked AT&T to re-engage Individual FR-2's firm, and La Schiazza wrote to him: "Following up on the consultant matter you brought to my attention. . . . Although the person in question has not yet been notified I wanted to let you know that we are going to re-engage her. (or at least make an offer to do so) She should hear about this shortly. Please don't communicate this to her but feel free to communicate to the contact [a reference to Madigan] that brought this to your attention." McClain responded, "I will tell our Friend," a reference to Madigan. AT&TIL-0008476. After that, Individual FR-2's contract was renewed for calendar year 2016 as well as 2017. AT&TIL-0000208 (2016 contract).

The government anticipates presenting evidence that McClain's recommendations were so persistent and regular that AT&T Illinois began to budget for "our Friend in Quincy Referrals," a reference in this instance to McClain, who is from Quincy, Illinois. AT&TIL-0012763; *see also* AT&T-IL0006216.

## B. Evidence Concerning Other AT&T Hires Made at the Defendants' Request Is Highly Relevant Direct Evidence of the Existence of the Enterprise and the Pattern of Racketeering.

Evidence concerning other AT&T hires made at Madigan's request is direct evidence of the RICO conspiracy charged in Count One. As discussed above, Count One alleges that the Madigan Enterprise sought to "financially reward MADIGAN's political allies, political workers, and associates for their loyalty, association with, and work for MADIGAN," including by "soliciting and receiving bribes and unlawful personal financial advantage from persons and parties having business with the State of Illinois and the City of Chicago, or otherwise subject to the authority and powers vested in MADIGAN and other public officials acting on MADIGAN's behalf." R. 37 at 6-7. AT&T was unquestionably one such third-party from which Madigan and McClain sought to extract benefits, not only in 2017 but during the Count One conspiracy period. This evidence is thus direct evidence of the Count One conspiracy; not only does the evidence prove the existence of the enterprise, but it also is proof of the pattern of racketeering the defendants agreed to engage in.

## C. Evidence Concerning Other AT&T Hires Made at the Defendants' Request Is Also Independently Admissible Under Rule 404(b).

Even if Rule 404(b) did apply, and it does not, evidence concerning defendants' other efforts to secure lucrative contracts for Madigan allies is admissible for the non-

propensity purpose of demonstrating their corrupt intent in linking hiring requests directed to a regulated entity to official action in Springfield. This evidence is relevant to defendants' intent, without relying on the forbidden propensity inference that the defendants must have solicited a bribe with regard to Individual FR-1 in 2017 because they made similar requests on other occasions. Defendants' persistent efforts with AT&T, in which they ignored whether AT&T had any legitimate business need for the hires, demonstrate their understanding of the corrupt purpose and intent underlying payments solicited from AT&T, ComEd, and other companies.

As with the gas company recordings, discussed above, defendants' pattern of conduct with regard to AT&T shows that they were well aware of Madigan's ability to exploit the vulnerability of regulated utility companies, and took advantage of that vulnerability. This evidence is thus admissible for the purpose of proving the conspirators' intent, knowledge, *modus operandi*, and plan. *See, e.g., Vaughn*, 267 F.3d at 659.

### D. The Evidence Is Not Unfairly Prejudicial.

Evidence of the defendants' efforts to secure other hires with AT&T is highly probative, and its probative value is not substantially outweighed by the risk of unfair prejudice. *See* Fed. R. Evid. 403; *Chanu*, 40 F.4th at 545. Here, the evidence constitutes proof of the racketeering conspiracy, and intent will be a key issue in dispute. Because this evidence is highly probative as to the existence of the charged racketeering conspiracy and the defendants' intent in securing high paying consulting positions for Madigan's cronies from regulated entities, it should be admitted.

## VI. Motion 6: Evidence Concerning McClain's Role as Madigan's Agent in Connection with Major Legislation Should Be Admitted.

### A. Background

The government intends to call Representative Robert Rita as a witness and seeks leave to introduce testimony concerning Rita's interactions with McClain on gaming legislation, as well as recordings between Rita, McClain, and others, that demonstrate the manner in which McClain acted as Madigan's agent with regard to gaming legislation. *See, e.g.*, McClain Phone, Session #2655 (5/16/2018), 2657 (5/16/2018), 2706 (5/16/2018), 13750 (10/24/2018), 14470 (11/2/2018), 16195 (11/16/2018), 17381 (11/30/2018), 21736 (3/4/2019), 21792 (3/5/2019), 21928 (3/6/2019), 24007 (3/25/2019), 24013 (3/25/2019), 24088 (3/26/2019).

Representative Rita has been a member of the Illinois House of Representatives since 2003. Rita worked with McClain on crafting major gaming legislation, starting in 2013, and took direction concerning the legislation from McClain, who was acting on behalf of Madigan, as corroborated by intercepted calls over McClain's phone that the government seeks to introduce at trial. McClain himself was not an elected Illinois representative or a member of Madigan's staff at this time and did not have any gaming clients as a lobbyist. Rita's testimony, as well as recordings that demonstrate that McClain acted as Madigan's agent on gaming legislation.

In March 2019, for example, McClain gave guidance to a member of Madigan's staff and Rita about hearings related to the gaming legislation. McClain Phone, Session #21736 (3/4/2019). McClain told Rita, "I talked to a friend of ours [Madigan] and um, he thinks it's time that you get activated on your sub-committee." Later in the same call, McClain

directed Rita to conceal from a member of the Speaker's office staff who was working on the gaming bill that this direction came from Madigan ("Hey Bob you oughta, uh when you talk to Joe tell him that um, don't use Madigan's name, but tell him that it's time to start activating the subcommittee.") *Id.*

Rita asked McClain for his advice about the gaming legislation on other occasions. *See, e.g.*, McClain Phone, Session #13750 (10/24/2018), 21792 (3/5/2019), 24088 (3/26/2019). In one call, McClain expressly spelled out his role in the gaming legislation; "I'm sort of Madigan's agent . . . I'm guiding Bob [Rita] on those hearings." McClain Phone, Session #14470 (11/2/2018).

Madigan also used McClain's cell phone to call his Chief of Staff about the gaming bill. In that call, Madigan asked his Chief of Staff to ensure that Rita was an active participant in certain gaming hearings. McClain Phone, Session #24007 (3/25/2019). McClain followed up with Rita after that and told Rita that Madigan wanted him to be a major participant in the gaming hearings. McClain Phone, Session #24088 (3/26/2019).

**B.** **Evidence Concerning McClain's Role as Madigan's Agent in Connection with Major Legislation Is Highly Relevant Direct Evidence of the Existence of the Enterprise and Proof of McClain's Role as to the ComEd Bribery Charges.**

Evidence that McClain acted as Madigan's agent with respect to major legislation, such as gaming, is evidence of the charged enterprise. As noted several times earlier, the superseding indictment alleges that Madigan was the leader of the enterprise, and that he directed McClain's activities; it further specifies that McClain conveyed Madigan's instructions and messages to other public officials. R. 37, Count 1 ¶ 9. McClain's conduct with reference to the gaming legislation thus helps establish the existence of the agent

relationship between Madigan and McClain as alleged in Count One, and McClain's role as a trusted intermediary, including with other public officials. McClain's work on gaming is also direct evidence of his role of "providing strategic advice to MADIGAN on sensitive political matters." *Id.*

McClain's involvement with Rita also constitutes evidence of another charge—the conspiracy to solicit bribes from ComEd alleged in Count Two—in that McClain also provided Rita assistance on 2016 legislation for ComEd known as the Future Energy Jobs Act ("FEJA") that Rita sponsored in the Illinois House. On the eve of FEJA's passage on December 1, 2016, McClain told Rita that it was okay to adopt a last-minute amendment to ComEd's FEJA legislation. Rita's prior experience with McClain on the gaming legislation helps to explain why Rita accepted McClain's guidance with regard to ComEd's FEJA legislation in December 2016. Rita is expected to testify that he trusted that McClain would not give guidance that was inconsistent with Madigan's wishes, since McClain acted as Madigan's agent and close confidante.

The evidence of McClain's role in the gaming legislation—including the directions he gave to Rita on Madigan's behalf—also demonstrates how Madigan delegated important control over the direction of legislation to McClain. This evidence helps to prove that McClain was also acting on Madigan's behalf in regard to the FEJA bill in December 2016, which like gaming, was a major piece of legislation. Without evidence of McClain's prior guidance to Rita on Madigan's behalf on gaming prior to FEJA's passage, the jury will have no context to understand why Rita would believe McClain was speaking for Madigan when McClain told Rita it was okay to adopt the last-minute FEJA

amendment. It is highly relevant for the jury to understand why Rita understood McClain to be acting as an agent for Madigan during that conversation: As Rita well knew, at the time of the last-minute FEJA conversation, McClain had been guiding Rita at Madigan's behest for more than three years regarding gaming. McClain's work on Madigan's behalf on gaming is thus direct evidence of the roles in the enterprise, as this evidence helps to explain McClain's relationship with Madigan as his trusted agent and advisor.

### C.    The Evidence Is Not Unfairly Prejudicial.

The fact of gambling, and the existence of gaming legislation, is not unfairly prejudicial. A jury will not decide the case based on any sort of adverse reaction to the concept of gambling as being some type of unsavory act. Gambling is legal in Illinois and multiple casinos are located in northern Illinois. Sports betting websites are frequently advertised on television and other media. There is no stigma whatsoever to this evidence and evidence about gaming legislation is not unduly prejudicial in this case.

This is especially so because the government does not intend to elicit any testimony about the substance of the gaming legislation. The limited testimony and evidence about gaming that the government will elicit is narrow in scope (in that it will focus on McClain's role in acting as Madigan's agent in regard to the legislation, including providing direction on Madigan's behalf to the sponsor of the legislation) and would not prejudice the defendants, and certainly would not rise to the level of being unfairly prejudicial under Rule 403. The narrowly tailored evidence described above will not portray gaming legislation—or defendants' involvement—as disreputable conduct based

on the subject matter of the legislation and will not be unfairly prejudicial. McClain's work as Madigan's agent with regard to two major pieces of legislation during the charged conspiracy is highly relevant, and its probative value far outweighs any potential prejudice.

Judge Leinenweber ruled that evidence of McClain's role in gaming legislation was not direct evidence of the charged conspiracy and that the Rule 403 balancing factors counseled against admission. Judge Leinenweber excluded the gaming-related recordings on this basis. *McClain*, No. 20 CR 812, Dkt. 161 at 2; Trial Tr. 704-08. However, Judge Leinenweber permitted Rita to testify about McClain's role in the gaming legislation, without mentioning that the legislation related to gaming. Trial Tr. 704-08.

Thus, during the ComEd trial, Rita testified that in the spring of 2013, Madigan brought him into his office and informed him that he would be sponsoring a major piece of legislation—a sanitized reference to the gaming legislation. Trial Tr. 967-68. Madigan told Rita that he (Madigan) had a conflict with the legislation, and instructed Rita that McClain would "guide you" and "will be your contact to help you." Trial Tr. 968. For years after that, Rita worked on gaming legislation with McClain, and understood McClain's guidance to be guidance from Madigan. Trial Tr. 968-70. Thus, when McClain told Rita it was "okay to adopt" a last-minute amendment to ComEd's FEJA legislation, added on the eve of its passage on December 1, 2016, Rita testified that he "knew Mike [McClain] wouldn't give me bad advice or have me do something that would be not in line with Speaker Madigan." Trial Tr. 984.

41

The government respectfully submits that Judge Leinenweber's rulings prohibiting the jury from knowing what type of legislation was at issue (and prohibiting the government from presenting wiretap calls of the men discussing the legislation) was erroneous. The analysis here is different, because Madigan and McClain are charged with participating in a RICO enterprise. In this case, unlike the charges in the ComEd case, the government must prove the existence of a RICO enterprise, and Madigan's and McClain's respective roles in the enterprise. McClain's role as Madigan's agent with regard to major legislation such as the gaming legislation is plainly relevant enterprise evidence. *See, e.g., Salerno*, 108 F.3d at 739. The government should be permitted to elicit testimony that specifically mentions gaming legislation, and play recordings that show McClain acting as an agent with regard to gaming legislation. The jury need not be deprived of the details of this story. See *Johnson*, 89 F.4th at 1004 ("prosecution is entitled to prove its case by evidence of its own choice," thus allowing government to tell "a colorful story with descriptive richness," the persuasive power of which is "often essential" for jurors to do their jobs).

## VII.   Motion 7:   Evidence Concerning McClain's Role in Response to Sexual Harassment Allegations Should Be Admitted.

### A.   Background

McClain also performed sensitive work for Madigan in crafting a response to sexual harassment allegations that affected the Illinois Democratic Party in 2018. The government seeks to introduce testimony and wire interceptions regarding this matter, and in particular, McClain's role in handling this sensitive work on Madigan's behalf.

As one example, McClain helped hire a crisis management firm in the wake of a number of sexual harassment allegations impacting Illinois Democrats. *E.g.*, McClain Phone, Session #5092 (6/6/2018), 5121 (6/6/2018), 5665 (6/11/2018).

One individual accused of inappropriate conduct in 2018 was then Representative Lou Lang. McClain was involved in the political response starting with the first allegations against Lang in May 2018. McClain Phone, Session #4317 (5/30/2018). In a recorded call placed in November 2018, Madigan asked McClain to deliver the message to Lang that he had to step down from the Illinois House of Representatives. McClain Phone, Session #14849 (11/6/2018), 15018 (11/7/2018). As Lang is anticipated to testify, McClain followed Madigan's instructions and, after expressly referring to himself as an agent, told Lang that he had to leave the General Assembly. McClain Phone, Session #15167 (11/8/2018). Shortly after McClain's call with Lang, McClain informed Madigan that Lang would resign from public office. McClain Phone, Session #15204 (11/8/2018); *see also* McClain Phone, Session #15768 (11/13/2018).

During the trial in *United States v. McClain et al.*, Lang testified about the November 8, 2018 call in which McClain advised him to step down from office. Trial Tr. 620-24. He testified that "it was very clear to me that there had been a decision made by the Speaker that I was not going to move up in the ranks." Trial Tr. 623. Lang testified that he was not surprised McClain came to him, "[b]ecause Mr. McClain was the person who was often sent by the Speaker to talk to members about various issues involving the workings and operations of the Illinois House of Representatives." *Id.* at 624.

### B. Evidence Concerning McClain's Role in Response to Sexual Harassment Allegations Is Highly Relevant Direct Evidence of the Enterprise and McClain's Role as an Agent.

Evidence of McClain's role in helping to manage the response to sexual harassment allegations on Madigan's behalf demonstrates the manner in which McClain acted as Madigan's agent and delivered directives to government officials and employees on Madigan's behalf. In fact, as the Lang situation illustrates, Madigan entrusted McClain with telling a sitting legislator to resign from a decades-long career in office. McClain's role in these sensitive discussions demonstrates the trust Madigan placed in McClain and is highly probative enterprise evidence. *See Salerno*, 108 F.3d at 739.

McClain's role is thus direct evidence of the allegations in Count One, including that McClain served the enterprise by "providing strategic advice to MADIGAN on sensitive political matters" and by "acting as MADIGAN's agent for the purposes of conveying MADIGAN's instructions, requests, and messages to third parties." R. 37 Count 1, ¶ 9.

### C. The Evidence Is Not Unfairly Prejudicial.

The probative value of McClain's role in the sexual harassment response is not outweighed by any potential prejudice. The evidence will be offered for the limited purpose of showing how close Madigan and McClain were and their roles in the enterprise. The government will not present any evidence that Madigan or McClain were themselves accused of sexual harassment.

If the Court were concerned about potential misinterpretation of this evidence by the jury, it could provide a limiting instruction to consider it strictly for proper purposes.

*See, e.g., Bruce v. Levy Premium Foodservice Ltd. P'ship*, No. 3:16 C 2734, 2019 WL 11704226, at *5 (M.D. Tenn. Apr. 2, 2019) (denying motion *in limine*, reasoning that a limiting instruction that the case was not about sexual harassment, but about retaliation from sexual harassment complaints, was sufficient to clarify issues for the jury and reduce any prejudicial effect); *Newmark Realty Capital, Inc. v. BGC Partners, Inc.*, No. 16-cv-01702-BLF, 2018 WL 6439133, at *3 (N.D. Cal. Dec. 7, 2018) (while recognizing that discussion of sexual harassment "can stir the passions of the jury," concluding an instruction limiting the use of such evidence to relevant issues can sufficiently reduce potential prejudice).

## VIII. Motion 8: Evidence Concerning Madigan's Efforts to Interfere with Employment Decisions at Metra for the Benefit of His Associates Should Be Admitted.

### A. Background

During the Count One conspiracy, Madigan took steps to obtain a raise and other positions for his associates at Metra. The former executive director/CEO of Metra is expected to testify that a member of Metra's governmental affairs department told him that Madigan wanted a Metra employee (who was a political supporter of Madigan's) to receive a pay raise and another employee to receive a union job. The executive director refused to accommodate this request.

Madigan subsequently complained to Metra's board chairman. At a meeting concerning whether to renew the executive director's contract, it was made clear to the executive director that the chairman of the board of Metra planned to assess what

damage the executive director had done to Metra by not agreeing to Madigan's requests. The executive director's contract was not renewed.

**B.** **Evidence Concerning Madigan's Efforts to Interfere with Employment Decisions at Metra for the Benefit of His Associates Is Highly Relevant Direct Evidence of the Enterprise.**

Metra is a third party with business before the Illinois legislature from which Madigan sought benefits for his personal allies. Madigan's conduct regarding Metra is thus exactly the type of conduct that is alleged to be within the objectives of the charged enterprise; Madigan's efforts to have a raise given to a political ally is proof of enterprise, as it shows the purpose of the association in fact, and efforts by Madigan through his positions to award political allies.

**C. The Evidence Is Not Unfairly Prejudicial.**

The probative value of this evidence is particularly high, as it demonstrates Madigan's personal efforts to interfere in the internal processes of entities that are subject to government regulation in order to enrich his associates. In light of the other allegations in the superseding indictment, the probative value is not substantially outweighed by unfair prejudice.

46

## CONCLUSION

For foregoing reasons, the government respectfully requests that the Court grant its motions *in limine* and rule that the categories of evidence detailed above are admissible as direct evidence, or in the alternative for a non-propensity purpose under Rule 404(b).

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

/s/ *Amarjeet S. Bhachu*
AMARJEET S. BHACHU
DIANE MacARTHUR
TIMOTHY CHAPMAN
SARAH E. STREICKER
JULIA K. SCHWARTZ
Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5300